# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Lisa H.,

                Plaintiff,

v.

Kilolo Kijakazi, Acting Commissioner
of Social Security,

                Defendant.

Case No. 20-cv-2061 (HB)

**ORDER**

---

HILDY BOWBEER, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Lisa H. seeks judicial review of a final decision by the Commissioner of Social Security denying her application for disability insurance benefits. This matter is before the Court on the parties' cross-motions for summary judgment [ECF Nos. 22, 28]. The parties consented to the undersigned judge's jurisdiction. For the reasons set forth below, the Court grants Plaintiff's motion and denies Defendant's motion.

## I.    BACKGROUND

### A.    Procedural Background

On October 25, 2017, Plaintiff filed an application for disability insurance benefits, alleging disability beginning January 25, 2017. (R. 143[1].) The claim was denied initially on February 9, 2018, and upon reconsideration on July 13, 2018. (*Id.*)

---

[1]  The Court cites the Social Security Administrative Record as "R." and uses the pagination that appears in bold in the lower right corner of each page.

Plaintiff requested a hearing with an Administrative Law Judge (ALJ), and she appeared and testified at the hearing held on November 20, 2019, in Minneapolis, MN.  (*Id.*)  A vocational expert (VE) also testified at the hearing.  (*Id.*)  The ALJ denied her claim on December 17, 2019.  (R. 157.)  The Appeals Council denied Plaintiff's request for a review on July 31, 2020.  (R. 1.)  Plaintiff then appealed the denial to this court on September 28, 2020.  (ECF No. 1.)

### B.    Relevant Records

The Court will recount the record evidence only to the extent it is helpful for context or necessary for resolution of the specific issues presented in the parties' motions. Plaintiff argues that the ALJ failed to fully and fairly develop the record regarding Plaintiff's residual functional capacity (RFC)[2], discounted the opinion of Plaintiff's treating physician without sufficient explanation in the RFC, and failed to account for her somatoform disorder when assessing disability, (Pl.'s Mem. [ECF No. 34]), so the Court focuses on the records pertinent to those issues.

### 1.    Plaintiff's Medical and Functional Records

In August 2015 Plaintiff reported to Krysta Hrdlichka, PA, that she fell down the stairs of her apartment, struck her head and neck, and developed worsening headaches, blurry vision, ear ringing, and neck pain.  (R. 781.)  Hrdlichka noted Plaintiff's history of chronic pain including fibromyalgia and 2012 diagnoses of somatic dysfunctions of the ribs and cervical, thoracic, sacral, and pelvic regions.  (R. 781–782.)  Plaintiff also

---

[2] An individual's RFC measures the most that person can do, despite her limitations, in a work setting.  20 C.F.R. § 404.1545(a)(1).

reported to Peter Boardman, M.D., that she was experiencing headaches and neck and back pain, and that occipital nerve blocking was not helping; she was also blanking out and struggling to focus on complex, multipart tasks at work. (R. 568.) Boardman opined that Plaintiff may be suffering from an adjustment disorder because of her fall, and he prescribed a pain medication and recommended counseling. (R. 568.)

In pain management questionnaires completed in November and December 2015, Plaintiff identified pain, numbness, and weakness along her spine, neck, shoulders, arms, hands, and pelvis, and bad headaches, sensitivity to sound, dizziness, tight, strained neck muscles, and inattention to detail and focus. (R. 855, 865.) Plaintiff began receiving injections, pain medications, and osteopathic manipulations to manage the pain. (*See, e.g.,* R. 761–762, 1042, 1051, 1063.) She also received a diagnosis of occipital neuralgia. (R. 872.) Plaintiff took various pain medications for her fibromyalgia and the pain in her neck, back, shoulders, and arms from late 2015 through the end of the record. (*E.g.*, R. 1853, 1928, 2602, 2832.)

Throughout 2016, Plaintiff reported to her pain management clinic numbness, pain, and tingling in her left arm, neck, back, and head, headaches, and periodic weakness, all interfering with sleep and daily activities. (R. 1926–27, 1951–52, 1957–58, 2600, 2613–14, 2619, 2622.) She regularly reported pain at or above 7 out of 10. (R. 1896, 1906, 1923, 1940, 1957, 2600, 2604, 2607, 2611, 2613, 2619, 2622, 2625, 2636.) Her providers at the clinic noted tenderness along her spine and neck, aggravated by moves that loaded, rotated, or flexed her spine, and some muscle spasms in her back. (R. 1884, 1952, 2601–02, 2630, 2636.) They also noted her obesity. As for mental status,

they noted some anxiety and depression, but otherwise unremarkable findings. (R. 1927, 1958.) David Schultz, M.D., attempted nerve blockers to relieve her facial pain, with only short-term relief; he also provided occipital nerve blockers to relieve headaches, and steroid injections and radiofrequency neuroablation (RFA) to relieve her pain from what Schultz diagnosed as cervical intraspinal inflammation and radiculopathy with persistent, disabling, periodically severe symptoms. (R. 1896, 1906, 1923, 1940, 2078, 2603, 2606, 2609, 2616, 2626, 2634, 2636.)

Also in 2016 Plaintiff saw Bethany Englom, D.O., for manipulation and started seeing chiropractor Gerald Rupp. (Tr. 1183-1184, 1370-1371, 2345-2348). She saw Rupp on a steady basis every few months from 2016 to 2019 for neck and back pain. (R. 2345–48, 2924–28, 2950.) Rupp consistently observed tightness in the left and right thoracic paraspinal areas, left and right trapezius, and left and right lumbar paraspinal areas; spinal subluxation along the length of Plaintiff's spine; and in 2019 tenderness at multiple points on her spine. (R. 2345–48, 2924–28, 2950.) Plaintiff reported total numbness in her left arm in July 2016. (R. 1359.)

Plaintiff suffered a miscarriage in August 2016. (R. 1510.) While recovering in September 2016, she sought a letter from Hrdlichka reducing her hours at her bank teller job based on pain, feet swelling from standing, numbness in her arms from manipulating cash and computers, and headaches from looking at computer screens, which she experienced when working her 8–10 hour shift. (R. 1701.) Both Hrdlichka and Plaintiff's OB/GYN, Jennifer Ann Slostad, M.D., refused to endorse the restrictions and recommended that Plaintiff follow up with pain clinic specialists to have her pain

evaluated.  (R. 1701–02, 04–05.)

Plaintiff switched to Peter Donald Schill, M.D., as her primary care provider in October 2016.  (R. 1585.)  Schill repeatedly noted in his exams a tenderness in Plaintiff's neck and observed that palpating her right forearm caused paresthesias in her right thumb.  (R. 1585, 1590.)  He repeatedly noted no concerns on mental status exams.  (R. 1585, 1590.)  In December 2016, Slostad noted no tenderness and full range of motion in Plaintiff's neck, and normal mental status.  (R. 1598.)

Plaintiff became pregnant again in December 2016.  (R. 1760.)

Throughout 2017, Plaintiff reported headaches, numbness in left arm, and limited back and neck movement to her pain clinic providers.  (R. 2639.)  Her pain during visits continued to be high, at or above 7/10.  (R. 1855–56, 1884, 2639.)  Schultz and other pain specialists continued to note tenderness in her spine and pain from spine loading moves.  (R. 2639, 2650.)  Schultz also continued with steroid injections in her back.  (R. 1855–56, 1884, 2639, 2650.)  He also treated her with RFA to her face, which relieved her facial pain.  (R. 1864, 1875.)

In January 2017, Plaintiff reported daily migraine headaches, but presented without any apparent distress, back tenderness, or extremity problems.  (R. 1763–64.)  She was working 25 hours per week.  (R. 1763.)

In February 2017, Plaintiff reported to an Urgent Care center with abdominal and back pain from her fibromyalgia and numbness in her neck radiating down her left arm, exacerbated in the preceding two weeks by reducing her pain medication on account of her pregnancy.  (R. 1465.)  The provider noted no back tenderness and full range of

motion in back and extremities.  (R. 1466–67.)

In April 2017, Plaintiff reported to Schill significant back and muscle pain since decreasing her oxycodone due to her pregnancy.  (R. 2339.)  Schill noted no obvious general distress and no mental status concerns, but made no notes on that visit about range of motion or pain in Plaintiff's neck, back, or extremities.  (R. 2339.)

In June 2017, Plaintiff saw Matthew Hawkins, PA, for pain and paresthesias in her neck, low back, and extremities.  (R. 2089.)  Plaintiff reported that the steroid injections she had received for the past two years did not relieve her pain.  (R. 2090.)  Hawkins noted that Plaintiff was alert, fully oriented, in moderate discomfort, had reduced neck motion in all directions, walked with a guarded gait, demonstrated significant increased lower back pain with joint loading, showed breakaway strength in left extremities secondary to increased neck and low back pain, and had reduced sensation to light touch in the left extremities compared to right.  (R. 2090.)  Following that visit, Plaintiff obtained updated MRI images showing at the C5-C6 region a mild disc height loss and moderate subligamentous and left foraminal disc extrusion resulting in severe left neural foraminal stenosis.  (R. 2094.)

Plaintiff saw Stefano Sinicropi, M.D., in August 2017 for a consultation on spine surgery for the pain and paresthesias in her back, neck, and extremities.  (R. 2082.)  Based on the June 2017 MRI imaging, Sinicropi diagnosed moderate subligamentous and left foraminal C5-C6 disk herniation, causing severe impingement in Plaintiff's left C6 neural foramen.  (R. 2082.)  Sinicropi recommended disc replacement surgery, to take place after Plaintiff delivered.  (R. 2082–83.)  Sinicropi noted the same examination

results as Hawkins had reported.  (R. 2083.)

Plaintiff saw Schill in August 2017 for pain management related to her fibromyalgia; Schill noted generalized tenderness and continued Plaintiff on oxycodone for pain management though she reported continued pain despite the medication.  (R. 2336.)

On August 19, 2017, Plaintiff gave birth by cesarean section.  (R. 2233.)  In August and September follow-up visits, Slostad noted Plaintiff had full range of motion in extremities with no tenderness in her back, normal gait, and no mental status concerns. (R. 2271, 2278.)  In August and September, Schill noted good eye contact, appropriate affect, unpressured speech, and no psychomotor agitation, but recorded no notes about range of motion or pain in Plaintiff's neck, back, or extremities.  (R. 2183, 2329.)

In October 2017, Plaintiff saw Schill for an injection to manage pain.  (R. 2494.) She reported muscle tightness all over from her fibromyalgia, and chronic pain in her right SI joint, particularly when standing up from sitting or attempting to walk.  (R. 2495.)  Schill noted no obvious distress generally, no mental status concerns, but tenderness over the right SI joint.  (R. 2495.)  Two days after the injection, Plaintiff called multiple times trying to reach Schill or a nurse to discuss new intense pain.  (R. 2503.)

Plaintiff submitted a function report in November 2017.  (R. 386.)  She identified her impairments as anxiety, depression, occipital neuralgia, fibromyalgia, muscle spondylosis, and a ruptured spinal disc.  (R. 386.)  She identified her symptoms as limited mobility in her arms and painful electric numbness shooting from neck to feet.  (R. 386.)

She indicated her symptoms and impairments prevented her from fully bending over, carrying even as much as 10 pounds, showering, writing or typing without assistance, using hands for longer than a few minutes without numbness, standing for longer than 10 minutes without pain, walking for 15 minutes or a quarter-mile without pain and needing to stop for an hour, sitting or kneeling for longer than 30 minutes without pain, climbing long staircases; she also struggled to put on clothes, hold utensils without dropping them, sit and wipe on the toilet, and think, focus, or concentrate on written and spoken instructions, or sleep through the pain; she experienced multiple weekly panic attacks and crying bouts.  (R. 386–87, 391–92.)

In that November 2017 function report she described her usual activities of daily living (ADLs) as changing, burping, and feeding her infant child, walking and bathing her two dogs, and yoga and baths, which she primarily performed while her husband worked.  (R. 387.)  She indicated she used carriers and props to limit how much she held her child for fear of dropping her.  (R. 387.)  She daily prepared frozen foods and other foods requiring little preparatory work using only the microwave and toaster oven because of her difficulty holding and manipulating things.  (R. 387–88.)  With her numbness, pain, and limited movement, she could wash laundry but not fold it, wash dishes for a few minutes, and vacuum twice a month with multiple breaks for pain relief, but relied on her husband for all other house and yard work.  (R. 388.)  She struggled to be motivated to do chores because of pain and depression.  (R. 388.)  She could walk and drive a car alone but preferred to avoid driving because she struggled to focus on the road.  (R. 389.)  She handled shopping online and requested store pick-up; she did not

8

walk.  (R. 389.)  Her daily hobbies included reading books, going online, and playing

with her daughter, but she propped up books, screens, and her infant because she could

not hold them, and could only do those activities for a limited time because sitting still

for long was painful.  She also walked her dogs, swam, and watched TV for short

periods.  (R. 390.)  She routinely visited her family, a shopping center, and doctors'

offices.  (R. 390.)  She described how the pain, anxiety, and depression transformed her

from an outgoing person eager to see friends into someone who stopped talking to people

or wanting to go out.  (R. 391.)

Plaintiff saw Schill and Sinicropi in November 2017 for a preoperative evaluation

for C5-C6 disc replacement surgery.  (R. 2701.)  Schill noted straight back, non-tender,

with full range of motion in all extremities.  (R. 2706.)  Plaintiff underwent the surgery

on November 29, 2017.  (R. 2713.)  Christy Timm-Hughes, RN, saw her at the hospital

the day after the surgery to consult on acute post-operative pain and chronic pain issues

including fibromyalgia and neck.  (R. 2736.)  Timm-Hughes noted that Plaintiff had

sharp, constant neck pain (6/10) aggravated by movement.  (R. 2737.)  Timm-Hughes

also noted Plaintiff was detailed and distressed when talking about her 2015 fall.  On

physical examination she showed strong grip strength in both hands and normal sensation

to light touch.  (R. 2746.)  Later that day, hospital staff noted Plaintiff had complete

independence with walking, grooming, dressing, and toileting, and modified

independence for bed transfer and mobility and chair transfer.  (R. 2756.)

Plaintiff also saw Alford Karayusuf, M.D., in December 2017 for psychological

consultation on behalf of the Social Security Administration (SSA) related to her

disability application.  (R. 2526.)  She reported her pain problems, ongoing anxiety and depression, stress of raising her newborn while worrying about her potential death (linked to her miscarriage), racing thoughts, and diminished concentration and memory.  (R. 2526.)  She reported she was not able to sleep consistently more than two hours at a time, spent 18 hours a day in bed with her child; she did not play any video games (although, somewhat confusingly, the report states elsewhere that she described playing video games as her primary hobby), movies, board games, or television, though she left the TV on in the background.  (R. 2526.)  She also reported bathing every day, grocery shopping twice a week, cleaning house a little, doing laundry, and washing dishes.  (R. 2526.)  The only concern Karayusuf reported on the mental status exam was Plaintiff's non-stop talking throughout the evaluation, which he described as "constant, rambling, digressive, tangential, and circumstantial."  (R. 2526–27.)  He diagnosed her with organic personality disorder, depression, and anxiety.  He opined she would be able to follow simple instructions but would not be able to interact with others or maintain pace due to her "incessant talking."  (R. 2527.)

In 2018, Plaintiff continued to receive spine injections and RFA to her face from Schultz to treat her back and facial pain.  (R. 2654, 2659–60, 2910, 2913.)

In February 2018, Plaintiff reported to Hawkins and Schill that her upper extremity pain and paresthesias were gone, but she had continued neck, upper back, and shoulder pain.  (R. 2763, 2765.)   Schill noted no concerns on physical and mental status exams.  (R. 2765.)

Plaintiff filed an updated disability report in March 2018.  (R. 396.)  She reported

the disc replacement relieved her arm numbness but intensified her leg and back pain. (R. 395.)  She could not bend, twist, or lift any weight; she struggled to get up from sitting; dressing, bathing, and personal care were painful and took much longer than prior to the surgery.  (R. 400.)  She could no longer take walks due to pain, or vacuum or do laundry because she could not lift, and could only wash dishes for short periods of time. (R. 400.)  Driving was painful and difficult, required her to turn her whole body to check blind spots due to limited neck mobility, so she only drove to see her parents and for doctor's appointments.  (R. 400.)

In March 2018, Plaintiff saw Ben Lexau, PsyD, for a behavioral health evaluation to prepare for a spinal cord stimulator implant.  She reported pain left her unable to work, do household chores, enjoy leisure activities, or participate in social activities; negatively impacted her relationships with friends, family, and spouse; and negatively impacted emotional wellbeing and self-esteem.  (R. 2656.)  She attributed increased pain to physical activity, so sought to avoid activity.  (R. 2656.)  On mental status examination, Lexau noted overelaborate thought processes and a preoccupation with pain and disability that "appear[ed] to be in excess of physical findings."  (R. 2658.)  Lexau wrote, "[Plaintiff] presents with symptoms of somatic system disorder, severe, with predominant pain focus," but he speculated her pursuit of Social Security benefits and an ongoing lawsuit from her 2015 fall might have informed her presentation.  (R. 2658.)  He suspected her somatic disorder would blunt the stimulator's benefits, and suggested she might benefit from psychological treatment, exercise, and lifestyle changes.  (*Id.*)

Plaintiff's husband submitted a function report in April 2018, which he wrote on

11

Plaintiff's behalf.  (R. 414–415.)  The report largely mirrored Plaintiff's updated disability report from March 2018, but added that she had a handle and seat in the bath because she struggled to get in and out, she stopped brushing her hair and shaving because she could not hold tools, she could only prepare frozen meals in a microwave a couple of times a week because she could not stand or hold items, she stopped all household chores because she hurt when doing them, her husband helped her eat unless she had quick-eat foods, and she had to change her wiping on the toilet because she could not turn.  (R. 415–417.)  She drove only for appointments and twice a month for groceries and essentials shopping.  (R. 417.)  She greatly reduced how much she walked her dogs, played with her daughter, swam, or watched TV because of pain and limited mobility.  (R. 418.)  She could lift only 5 pounds, walk 10 minutes or a quarter-mile before having to rest for 5 minutes, and usually forgot directions as she read them.  (R. 419.)  Her husband added from his perspective that she was hardly able to walk or do daily activities.  (R. 421.)

In spring 2018, Schultz, noting that Plaintiff's "history of intractable low back and leg pain secondary to lumbar spinal degeneration and intractable lumbar radiculopathy" and that she was "not a candidate for spinal surgery," implanted first a trial and then a long-term spinal cord stimulator in Plaintiff's low back to address the pain.  (R. 2834, 2838.)

In May 2018, Plaintiff saw Schill after she slipped in her tub and struck her neck against the edge.  (R. 2854.)  Schill noted non-tender and straight back with full range of motion in all extremities.  (R. 2857.)

In June 2018, Plaintiff reported significant lower back pain to Schill. (R. 2897.) She sought Schill's input to her Social Security application, but he expressed that he had "limited objective evidence to support her disability" and noted that her surgeons had "refused to complete her paperwork." (R. 2898.) He expressed concern about his lack of experience with cervical disc replacements and spinal cord stimulators and his lack of knowledge about the "expected course of management or timeframe for relief." (*Id.*) Later that month, Plaintiff visited the emergency room complaining of abdominal pain. (R. 2873.) The attending provider noted no back or neck pain, nor any tingling, headaches, or focal weaknesses. (R. 2870.) Slostad also noted no neck pain, full range of motion, and no concerns on mental status in the notes of her June 2018 examination of Plaintiff. (R. 2895.)

Plaintiff updated her disability report again in July 2018, noting that her neck, back, and arm pain made it painful to lift her child, and reporting that her husband had to help with laundry or scrubbing because it was extremely difficult for her; getting dressed took much longer than it used to and was very painful; and that in her daily life she only cared for the baby, which was extremely challenging, and she did not go out or do anything because of depression and pain. (R. 425, 430.)

In October 2018, Plaintiff received two steroid injections in her back from Schultz. (R. 2939, 2937.) She also started on a new medication for her fibromyalgia, and noted improved energy, slightly decreased fibromyalgia pain, and slight weight loss. (R. 3007.) She reported continued SI joint pain. (R. 3007.) Schill noted tenderness over her right SI joint and on her upper arms, and administered a pain relief injection. (R. 3007.) At the

end of December 2018, Plaintiff reported to Schill that her hands and arms were numb, burning, and weak, and she struggled to do almost anything with them.  (R. 2984.)

In January 2019, Plaintiff fell down her stairs and struck her back on a metal railing.  (R. 2975.)  At a later appointment, she reported diffuse myalgias and tingling in hands and wrists.  (R. 2975.)  Schill noted good range of motion in all extremities, normal grip strength, and no evidence of atrophy of the thenar or hyperthenar eminences bilaterally.  He also reported widespread but noncontiguous areas of diffuse tenderness that at times elicited "howls of pain" but at other times elicited no reaction when touched while Plaintiff was distracted.  (R. 2975.)  Schill suspected Plaintiff had carpal tunnel syndrome.  (R. 2976.)

Plaintiff received another injection from Schultz in March 2019.  (R. 2935.)  In spring 2019, Schultz implanted a second spinal cord stimulator in Plaintiff's back after a successful trial, this time to address Plaintiff's "intractable neck pain secondary to spinal degeneration, cervical spine surgery and intractable cervical radiculopathy."  As he had a year earlier, Schultz again stated that she was not a candidate for further spinal surgery.  (R. 2930.)  During the evaluation of the trial simulator, Plaintiff reported that it was helpful with 90% of pain relief, and that her ability to perform ADLs had improved with the trial run in April.  (R. 2946.)

Plaintiff's husband submitted a third-party function report in May 2019.  (R. 444.)  He reported many of the same symptoms and functional restrictions that she had reported in 2018, but added that she spent the majority of the day in bed except when doing stretching therapy, playing with toys with their daughter, watching TV, or sitting on the

patio with their daughter and their dogs. (R. 444.) She could not walk the dogs anymore, and he had taken over walking and bathing them. (R. 445.) She was awake every hour and could not sleep due to pain. (R. 445.) She took 15 minutes to put on clothes, took 60–90 minute baths during which he had to help wash her, she had to lie down in the tub to wash her hair, she no longer did any house chores because she was not able to, and she had to switch to a bidet because she could no longer bend or reach to wipe herself. (R. 445–46.) She no longer went out to see her family, but only went out for provider appointments and to the store twice a month. (R. 448.) She needed instructions constantly repeated and clarified, and everything written down so she could refer to it when she forgot. (R. 449.) He also reported that she wore a back brace, prescribed in May 2019. (R. 450.)

In June 2019, Slostad completed a Medical Source Statement identifying Plaintiff's impairments as chronic neck and back pain with joint stiffness, restricted mobility, sensitivity to touch, impaired appetite, muscle pain, muscle atrophy, impaired sleep, chronic fatigue, anxiety, depression, difficulty concentrating, and reduced ability to attend to and persist in tasks. (R. 2841.) Slostad opined that Plaintiff could not work even part time or lift any amount of weight, and that these restrictions began with Plaintiff's disc replacement. (R. 2841.)

In August 2019, Plaintiff reported to Lawrence Donovan, D.O., pain in her neck plus pain and numbness in both arms when doing daily activities. (R. 3145.) She reported headaches, anxiety, and trouble sleeping. (R. 3146.) Donovan noted no abnormal mental status, normal gait, normal extension strength in arm muscles, and

pain/numbness in the dorsal aspect of her right hand.  (R. 3145.)  An EMG performed in

August 2019 at Schill's request showed median neuropathy in the right wrist "such as can

be seen in very mild right-sided carpal tunnel syndrome," but no evidence of left-sided

median neuropathy, right or left-sided ulnar neuropathy, or cervical radiculopathy.  (R.

3155.)

In November 2019, after repeated requests by Plaintiff, Schill agreed to complete a

medical source statement for her Social Security application "to the best [of his] ability

and based on [his] assessment of her situation."  (R. 3181, 3195.)  He noted that she had

seen an occupational therapist at his request but was not willing to do a physical

performance test "to clarify her physical limitations and restrictions" because it was not

covered by insurance and she could not afford the cost of the test.  (R. 3061, 3181.)

Schill noted no obvious distress on physical exam, and noted, consistent with prior

exams, an appropriate affect, good eye contact, unpressured speech, and no psychomotor

agitation.  (R. 3182.)

In November 2019, Schill provided a Medical Source Statement[3] in which he

identified Plaintiff's impairments as fibromyalgia, pain from her disc replacement, and

chronic neck and back pain with joint stiffness, restricted mobility, muscle spasm,

cognitive limitations, sensitivity to touch, impaired concentration, muscle pain, muscle

atrophy, impaired sleep, swelling, chronic fatigue, anxiety, depression, social withdrawal,

---

[3] The poor-quality scan of the statement in the record is difficult to read, especially
Schill's handwritten notes in the margin.  Plaintiff takes issue with this as described in the
discussion section below.

difficulty concentrating, reduced ability to attend to and persist in tasks, and difficulty with fine motor control. (R. 3160.) But he opined that Plaintiff could work full time, sitting 4–6 hours and standing 2–3 hours with 1–2 unscheduled breaks of 3–5 minutes "to move around"; could lift less than 10 pounds frequently, 10–20 pounds occasionally, and 50 pounds rarely; would miss 1 day of work a month; and would be off-task 5% of the time. (*Id.*) Notes in the margin indicate that "desk job or working from home would be best." (*Id.*)

### 2.      State Agency Reports

State agency medical consultants reviewed Plaintiff's application initially and on reconsideration. In February 2018, the initial consultant found she had severe impairments in the form of degenerative discs, fibromyalgia, depression, anxiety, and neurocognitive disorders, but they did not meet the criteria for disabling physical or psychological impairments nor did her RFC leave her unable to work. (R. 214.) The consultant found that her reported symptoms were only partially consistent with her ADLs as she reported them to Karayusuf and in her 2017 function report, and other evidence. (R. 216.) The consultant found some moderate limitations in cognitive and emotional functioning, and found she could occasionally lift and carry 50 pounds and stand or sit for 6–8 hours a day, and had no limits on pushing or pulling. (R. 219.) On reconsideration in July 2018, another consultant found that Plaintiff could only engage in light exertional activity rather than the medium activity found by the first consultant, but otherwise maintained the same findings. (R. 237.)

### 3.      Hearing Testimony

Plaintiff testified that she felt pain in her head, neck, shoulders, arms, hands, low

back, and down her legs when standing for five minutes, walking a couple hundred feet,

and sitting for ten minutes; at one point she told the ALJ that she had already stood up

four times during the hearing because of pain, but the ALJ replied that she had not seen

it.  (R. 185–86.)  She testified that her arms and fingers were painfully numb and asleep

during the hearing, a feeling she had constantly.  (R. 191.)  She also testified to an

upcoming cervical spine fusion surgery because of the failure of her disc replacement.

(R. 191–192.)  She reported leg pain from her misaligned pelvis caused by her

fibromyalgia.  (R. 193.)

She testified that during the day, she stayed home and watched her child, played

with her, changed her diapers, and watched children's shows.  (R. 187.)  Plaintiff could

not lift her child as an infant, so she changed diapers on the floor, then taught her child to

climb onto the changing table so Plaintiff could change diapers while standing.  (R. 179,

187.)  She could not bathe her daughter or take her to appointments.  (R. 197.)  She

testified her husband, mother, and sister primarily cared for her child.  (R. 179.)  She

described how her husband took time off work to care for their child when she was a

newborn and infant, and the family aligned its sleep schedule so Plaintiff and her child

slept when her husband worked to avoid Plaintiff having to care for the child alone.  (R.

179–180.)

She also reported the following limitations in her daily functioning:  She avoided

stairs because she claimed, "it feels like my spinal cord's being ripped from the lower

18

half of my body." (R. 178, 191.) She could not turn her head while driving. (R. 180.) She could not walk her two dogs. (R. 187–188.) She could only prepare meals using a toaster oven or microwave. (R. 188.) She could not bend or lift enough to do laundry. (R. 188.) Her inconsistent, shaky grip strength led her to constantly drop plates, glasses, and silverware. (R. 188, 205–206.) Her family switched to plastic dishware, and she noted that she dropped her utensils seven times during dinner the prior night. (R. 205–206.) She used a bidet because she could not bend to wipe herself on the toilet. (R. 191.) She last played video games a year earlier because she had developed migraines and vision distortion when looking at screens. (R. 187.) She could read books only a little bit. (R. 187.)

She reported that Schill believed only someone paralyzed or on her deathbed could not work, and that he was very reluctant to complete a medical statement about her functionality because he believed she could work since she was not paralyzed. (R. 194–196.)

The ALJ asked the VE whether a person could do Plaintiff's past work or find work in the national economy with the following hypothetical restrictions: Plaintiff's age, education, and work experience; ability to perform light work; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; occasionally reach overhead and frequently reach in all other directions; frequently handle and finger; not work in extreme cold or operate moving, dangerous machinery; carry out simple, routine instructions and tasks consistent with SVP level one or two; and occasionally interact with supervisors and coworkers, but not

perform tandem or group tasks or interact with the general public.  (R. 200.)  The VE

testified the person could not perform Plaintiff's past work but could work as a bench

assembler with 91,000 jobs nationally, weld inspector with 62,000 jobs nationally, or

garment bagger with 26,000 jobs nationally.  (R. 200-201.)  The VE also testified about

more restrictive hypotheticals with no bearing on this appeal.

### 4.        The ALJ's Determination

The ALJ found at step one that Plaintiff had not engaged in substantial gainful

activity since January 25, 2017.  (R. 146.)  At step two the ALJ found that Plaintiff had

the following severe impairments: degenerative disc disease; fibromyalgia syndrome;

plantar fasciitis; obesity; somatoform disorder; depressive disorder; anxiety disorder; and

personality disorder.  (R. 146.)

At step three the ALJ found that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled the severity of any of the

impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 147.)  The ALJ

considered the impact of Plaintiff's somatoform disorder[4] on her functioning and

symptoms, finding that it was a one-time diagnosis and that it was "somewhat consistent"

with the lack of examination findings but inconsistent with the daily activities Plaintiff

---

[4] Somatoform disorder (also called somatic symptom disorder or somatization disorder)
is a mental disorder in which a person actually experiences physical symptoms, including
pain, but the symptoms cannot be fully explained by or traced to a specific condition.
The symptoms can cause the person "excessive and disproportionate" emotional and
physical distress that impacts her daily functioning.  SOMATIC SYMPTOM AND RELATED
DISORDERS, https://www.webmd.com/mental-health/somatoform-disorders-symptoms-
types-treatment (last visited March 14, 2022).

reported in the November 2017 function report and to the consultative examiner

(Karayusuf), the "limited, but primarily consistent activities of daily living" she reported

on reconsideration, the symptoms she reported to her doctors, and her negative mental

status examination findings.  (R. 149.)

    At the start of step four, the ALJ found that Plaintiff had the following RFC:

> perform a range of work at a "light" level of exertion, as defined in 20 CFR 404.1567(b), the Dictionary of Occupational Titles (DOT), and its companion publication, the Selected Characteristics of Occupations (SCO), subject to all of the following additional limitations: she can never climb ladders, ropes, and scaffolds; she could occasionally climb ramps and stairs; she could occasionally balance, stoop, kneel, crouch, and crawl; she could occasionally reach overhead and frequently reach in all other directions, bilaterally; she could frequently handle and finger; she should not work at extreme cold, at unprotected heights, or have the operational control of moving, dangerous machinery; she could carry out simple, routine instructions and tasks consistent with SVP level 1 and 2 work; she could have occasional interaction with supervisors and coworkers, but should not be required to perform tandem or group tasks or interact with the general public, with this being further defined as work indicated as no more than an 8 in the SCO people rating.

(R. 149.)

    The ALJ found that although Plaintiff's impairments could be expected to cause

these symptoms, her claims about "the intensity, persistence, and functionally limiting

effects of the symptoms experienced since the alleged onset date, January 25, 2017, are

not generally consistent with the objective medical evidence and other evidence used to

assess allegations concerning symptoms."  (R. 150–151.)

    In explaining her RFC finding, the ALJ reviewed at length Plaintiff's medical

records from 2016 through 2019.  (R. 151–155.)  She recounted Plaintiff's hearing testimony (R. 153) and also cited repeatedly Plaintiff's November 2017 function report and the ADLs she reported to Karayusuf in December 2017, both in explaining her step two findings on impairments (R. 148) and in explaining her RFC (R. 152), although she made only oblique reference elsewhere in the determination to Plaintiff's subsequent reports of her functioning.  (*See* R. 153 (noting that "[o]n reconsideration, she reported limited, but primarily consistent activities of daily living, although she denied doing household chores").)  The ALJ found that Plaintiff's allegations about her physical function were highly inconsistent with the record because her physical examination findings were generally negative or minimal, with rare and inconsistent strength, sensation, and gait findings; Plaintiff's pain behavior was inconsistent and "sometimes went away when she was distracted" (a reference to Schill's report of his January 2019 examination); and Plaintiff's imaging and EMG/NCS showing primarily mild results besides her initial herniated disc imaging and mild right-sided carpal tunnel EMG result. (R. 153.)  The ALJ acknowledged the diagnosis of somatoform disorder, but found it notable that even Plaintiff's subjective reports of pain and self-reported ADLs were "highly inconsistent throughout the file."  (R. 153.)  The ALJ also described as notable Plaintiff's statements and conduct concerning unemployment compensation, observing that on the one hand she collected unemployment (which would have required her to certify to the state that she was able to and applying for work) but on the other she claimed that she could not work.  (*Id.*)

The ALJ found the state agency consultants' opinions of Plaintiff's physical

abilities were not sufficiently restrictive in view of Plaintiff's pain treatment, including

her need for a spinal stimulator, but were otherwise persuasive to the extent consistent

with Plaintiff's inconsistent reports of her ADLs and pain, and minimal clinical findings.

(R. 154.)

      As to Schill's medical source statement, specifically the function-by-function

opinion, the ALJ found that although it was not necessarily inconsistent with the ALJ's

ultimate determination,[5] it was "not persuasive" because it was "not consistent with the

minimal physical examination findings, inconsistent symptom reports, and inconsistently

reported activities of daily living." (R. 154.) She reiterated Plaintiff's "inconsistent"

pain behavior and the lack of regular gait findings that would be consistent with a

limitation to sedentary work. She also discounted Schill's opinion regarding work

absences as not consistent with Plaintiff's reported ADLs. (*Id.*)

      With regard to Plaintiff's mental impairment allegations the ALJ found them

highly inconsistent with the record, noting that she generally reported very mild mental

health symptoms to her treating clinicians. (R. 153.) The ALJ discounted Karayusuf's

opinion that Plaintiff could not interact with others because of "incessant talking," and

that Plaintiff had limited ability to understand and retain information, as not consistent

with the minimal mental status findings and the failure to relate it to any medically

determinable impairment. (R. 154.) Similarly, the ALJ found the agency medical

---

[5] The ALJ acknowledged Plaintiff's concern, expressed at the hearing, that Schill "did not believe even wheelchair-bound individuals were disabled," but emphasized that a finding of disability was reserved to the Commissioner, regardless of Schill's beliefs on the subject. (R. 154.)

consultants' opinions on Plaintiff's mental abilities to be overly restrictive in view of the

lack of any cognitive findings, Plaintiff's minimal mental symptom reports, and the

minimal mental status findings.  (*Id.*)

Based on the RFC, the ALJ found Plaintiff could not perform her past relevant

work.  (R. 155.)  At step five, the ALJ found there were sufficient jobs in the

representative occupations like bench assembler, weld inspector, and garment bagger for

Plaintiff to find work in the national economy.  (R. 156.)

### 5.    Post-Hearing Records

Plaintiff's counsel sent a letter to the ALJ on November 11, 2019 (nine days

before the hearing) asking that the ALJ hold the record open to allow submission of

records from an appointment scheduled for November 21 (the day after the hearing) with

Hawkins "to assess the results of her 2017 cervical disc replacement surgery and whether

she requires further surgery on her neck."  (R. 535.)  Counsel noted that Hawkins "may

also address [Plaintiff's] functional limitations at this appointment."  (R. 535.)  Counsel

reiterated the request during the hearing.  The ALJ declined to hold the record open for

the purpose of admitting those records, stating that she does not hold the record open for

"future treatment." (R. 171-72.)

After the determination was issued, however, Plaintiff submitted the following

additional records:  A spine CT scan performed on December 17, 2019 (the same day the

ALJ issued her determination) revealed the C5-C6 disc replacement was failing, with left

facet arthropathy, joint hypertrophy, mild right and severe left neural foraminal stenosis;

it also revealed loss of disc height in the C6-C7 region with joint hypertrophy and severe

left neural foraminal stenosis.  (R. 165.)  In visits with Hawkins[6] and Sinicropi in January

2020 Plaintiff reported 9/10 pain, with worsening paresthesias in her upper extremities

into her hands.  (R. 135.)  Based on the CT scan and Plaintiff's pain reports, Sinicropi

concluded that physical therapy and injections would not provide any long-term benefit.

He and Plaintiff agreed that Plaintiff should undergo surgery to remove the unstable disc

at C5-C6 and fuse her spine at C5-C7.  (R. 137.)

Sinicropi performed the surgery in March 2020.  (R. 16.)  Sinicropi followed up

with a medical source statement opining that due to Plaintiff's spinal issues and the

restrictions from the fusion surgery, plaintiff could not perform daily activities like

travelling, shopping, and stair climbing without assistance; work would increase her pain

making her unable to maintain persistence and pace in 8-hour, 5-day competitive

employment or part-time work; physical activity, movement, and static positioning all

exacerbated her symptoms; she would need to lie down during the day to relieve

symptoms; would miss 4 or days of work a month and require more breaks than usual

during the day; could occasionally lift less than 5 pounds; walk less than 1 block without

severe pain or rest; could sit for only 30 minutes and stand for only 10; could never bend,

twist, stoop, kneel, crouch, crawl, pull, push, grasp with either hand, reach overhead, flex

or rotate her neck, or walk up an incline, but could only occasionally climb stairs and

reach; she could not perform any repetitive tasks involving hands or arms, dexterously

---

[6] There was no record of a November 21, 2019, visit with Hawkins; it appears that
appointment was postponed to January 2020.

use hands or fingers or use them for repetitive tasks, or handle and manipulate small objects.  (R. 9-15.)

In February 2020, Plaintiff sought out psychiatric care for her anxiety and depression, reporting many of the same mental health symptoms from 2018 and 2019. (R. 122.)  The mental status exams of these visits revealed no concerns except for a depressed, irritable, anxious mood.  (R. 28, 125.)  In a follow-up, Plaintiff reported that she was sleeping only one to two hours a night, had high energy and was up and moving at all hours, and was irritable at small things and fighting with her family.  (R. 25.)  She had PHQ-9 scores in February and March of 21, 24, and 25, indicating severe depression, and GAD-7 scores of 18, 18, and 16, suggesting severe anxiety.  (R. 26, 71.)

Regarding the December 17, 2019, MRI, the Appeals Council concluded, "[it] does not show a reasonable probability that it would change the outcome of the decision," and the rest of the post-hearing evidence "[did] not relate to the period at issue. Therefore, it [did] not affect the decision about whether [Plaintiff was] disabled beginning on or before December 17, 2019."  (R. 2.)

II.   DISCUSSION

Plaintiff argues the ALJ (1) failed to fully develop the record because she did not leave it open for Plaintiff to supplement with subsequent spine exam and spinal surgery needs and she did not request a clearer copy of Schill's medical source statement; (2) failed to provide sufficient reason to discount Schill's medical source statement; and (3) did not adequately consider the impact of the somatoform disorder on Plaintiff's combination of impairments.

### A.    Standard of Review

The ALJ follows a five-step sequential evaluation process for determining disability for DIB.  20 C.F.R. § 404.1520(a)(4).  The five steps are: (1) whether the claimant's work activity, if any, is substantial gainful activity; (2) whether the claimant has any severe, medically determinable impairments meeting the duration requirement; (3) whether one or more of those impairments meets or medically equals the criteria of a listed impairment; (4) whether the claimant's residual functional capacity (RFC) allows her to do past relevant work; and (5) whether the claimant's RFC and age, education, and work experience allow her to adjust to other available work.  20 C.F.R. § 404.1520(a)(4)(i)–(v).  If an ALJ determines at any step that the claimant is disabled or not disabled, the ALJ need not continue further with the evaluation.  *Id.* (a)(4).  The claimant bears the burden in the first four steps to prove she is disabled and cannot perform past relevant work.  *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995).  The claimant is disabled if "[s]he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  At step five, the burden shifts to the Commissioner to prove "first that the claimant retains the residual functional capacity to do other kinds of work, and second that other work exists in substantial numbers in the national economy that the claimant is able to do."  *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

Judicial review of the Commissioner's denial of benefits is limited to determining whether the ALJ made a legal error and whether substantial evidence in the record as a whole supports the decision. *Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation omitted). "Substantial evidence in the record as a whole requires a more searching review than the substantial evidence standard." *Grindley*, 9 F.4th at 627; *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). A court must consider evidence that fairly detracts from the ALJ's decision. *Grindley*, 9 F.4th at 627. But a court may not "reweigh" the evidence or reverse the ALJ's decision "merely because substantial evidence would have supported an opposite decision." *Id.* "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Id.* A court will disturb the ALJ's decision only if it finds from the evidence as a whole that the decision "falls outside the available zone of choice." *Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021).

A court may also ensure the ALJ adequately explained her findings and conclusions. A court will not reverse when the ALJ's determination indicates which evidence the ALJ relied on and which she rejected, and her reasons for doing so, even if she did not discuss specific facts for specific findings and conclusions. *See Vance v. Berryhill*, 860 F.3d 1114, 1117–18 (8th Cir. 2017) (holding ALJ's findings at step four cured lack of elaboration at step three); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)

28

(holding that the ALJ does not need to discuss every piece of evidence submitted and that the failure to cite to specific evidence does not indicate that such evidence was not considered). But "inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand" if they might change the outcome of the determination; an ALJ, not a reviewing court, must resolve those issues. *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005). *See also Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822–23 (8th Cir. 2008) (reversing when the ALJ's factual findings were insufficient for the court to conclude whether substantial evidence supported the determination); *David S. v. Saul*, No. 19-CV-3137 (ADM/LIB), 2021 WL 467348, at *3 (D. Minn. Jan. 25, 2021), *report and recommendation adopted*, 2021 WL 465281 (D. Minn. Feb. 9, 2021) ("a reviewing court cannot search the record to find other grounds to support the decision of the ALJ") (cleaned up).

### B.    Whether The ALJ Failed to Develop the Record

Plaintiff first argues the ALJ failed to fully and fairly develop the record, to Plaintiff's detriment. An ALJ must develop the record to ensure a full and fair assessment of a claimant's impairments and functioning but is not obligated to seek out additional evidence when the available record provides sufficient evidence to make a determination. *See Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017); *Boyd v. Sullivan*, 960 F.2d 733, 736 (8th Cir. 1992).

### 1.    Whether the ALJ Erred by Failing to Seek Additional Medical Opinion Evidence

Plaintiff first argues the ALJ erred when she failed to obtain additional treating or

examining medical opinion evidence after she determined that the existing opinion evidence was either not persuasive or only partially persuasive. (Pl.'s Mem. at 28.) She argues that under these circumstances, and particularly in view of Schill's view that a physical performance test was needed to determine Plaintiff's work limitations, the Eighth Circuit's decision in *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001) required that she obtain additional treating or examining opinion evidence about Plaintiff's limitations. (*Id.* at 28-30.)

The ALJ is not limited to considering specifically articulated medical opinions, but must consider all of the evidence in the record relevant to the claim, "including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016); 20 C.F.R. § 404.1520b(a). But "[t]here is no requirement that an RFC finding be supported by a specific medical opinion." *Id.* at 932. Even in the absence of medical opinion evidence, "medical records prepared by the most relevant treating physicians can provide affirmative medical evidence supporting the ALJ's residual functional capacity findings." *Id.* Thus, the ALJ is not required to seek additional opinion or clarification from a treating doctor "unless a crucial issue is undeveloped." *Combs*, 878 F.3d at 647.

In *Lauer*, relied upon by Plaintiff, the Eighth Circuit Court of Appeals reversed the ALJ because the ALJ failed to clarify which medical evidence he relied on to determine the RFC and the court was not persuaded by the Commissioner's arguments about potentially supporting evidence. 245 F.3d at 704-06. But although the court held the ALJ should have sought out other medical evidence if he did not believe the available

30

medical opinions were sufficient to determine the RFC, it did not impose a rule that a

RFC must be based on medical opinion rather than other medical evidence. *Id.* at 706.

Here, by contrast, the ALJ considered and discussed the three years of

examinations, imaging, and tests from Schill, Schultz, Sinicropi, Slostad, Hawkins,

Karayusuf, and Lexau, plus the agency consultants' opinions and multiple function

reports. Plaintiff has not identified a "crucial issue [that was] undeveloped" in those

records. Thus, the Court finds the ALJ did not err by failing to seek out additional

medical opinions.

### 2. Whether the ALJ Erred by Not Allowing Plaintiff to Submit Additional Post-Hearing Evidence

Plaintiff also argues the ALJ was on notice at the hearing that she would be having

spinal fusion surgery, and had a duty to leave the record open for Plaintiff to supplement

with the 2019 and 2020 records detailing the need for the surgery. (R. 30-32.)

As previously noted, Plaintiff requested nine days before the hearing that the ALJ

hold the record open to allow submission of records from an upcoming appointment with

Hawkins to assess her disc replacement and possible need for future surgery. (R. 171–72,

535.) The ALJ declined to hold the record open on the ground that it constituted "future

treatment." (R. 171-72.)

A claimant must make every effort to submit all written evidence to SSA at least

five days before a hearing; if submitted later, the ALJ may decline to consider or obtain

the evidence unless an exception applies. 20 C.F.R. § 404.935. Plaintiff does not point

to any of the exceptions to the five-day rule that would apply here. The records did not

exist at the time of the hearing; rather, it was anticipated they would be created in the future. Furthermore, although Plaintiff insists the decision had already been made that she required additional surgery, the records do not reflect such a conclusion on the part of her providers. The appointment that was to take place the day after the hearing was an appointment with Hawkins, a physician assistant, and as it turned out, even that appointment did not happen until the following January. Plaintiff's most recent prior appointment with the spine surgeon, Sinicropi, had been in February 2018, and she did not see him to be evaluated for the cervical fusion surgery until January 2020, two months after the hearing and a month after the ALJ issued her determination.

True, the ALJ placed some emphasis on the fact that Plaintiff's representation that she would be undergoing cervical fusion surgery was at odds with the repeated statements by Schultz that she was not a candidate for further surgery, but the statement was consistent with the voluminous medical records up to and including the date of the hearing, which included not only Schultz's repeated statements to that effect but also the lack of any MRI imaging, medical opinions, examination results, or medical source statements to the contrary. As of the date of the hearing, the only person on record as stating that Plaintiff needed more surgery was Plaintiff herself. The ALJ did not err in limiting the record to relevant evidence from the time period before the hearing and not holding it open to receive information about subsequent evaluations and treatment. Furthermore, Plaintiff has not identified how the outcome would have changed even if she had done so.

Finally, the ALJ did not err by reviewing an unclear copy of Schultz's medical

32

opinion.  (Pl.'s Mem. at 32.)  Plaintiff speculates that the ALJ could not have effectively

reviewed the opinion due to the lack of clarity on the copy, but the ALJ did not indicate

either at the hearing or in the determination that she was unable to do so.  Moreover, the

Court was able to review the entire contents of the opinion in (presumably) the same

condition in which it was available to the ALJ.  (R. 3160.)  Finally, it was Plaintiff's duty

to submit legible records.  In the absence of a concrete basis to believe the ALJ could not

sufficiently discern the contents of the record, the ALJ did not err by failing to ask

Plaintiff to submit a more legible copy.

### C.   Whether the ALJ's Finding Regarding Schill's Medical Source Statement Was Supported by Substantial Evidence

Plaintiff next argues that the ALJ did not provide sufficient explanation for finding

Schill's opinion on her physical limitations not persuasive.  (Pl.'s Mem. at 32.)

The ALJ determines how persuasive she finds a medical source opinion based on

its supportability, consistency, the source's treating relationship with the claimant

(frequency of examinations, purpose, extent, examining relationship), the source's

medical specialization, and other factors like the source's familiarity with the SSA

program and evidentiary requirements.  20 C.F.R. § 404.1520c(c).  As a result of a

significant change in that regulation effective for applications filed after March 27, 2017,

the ALJ no longer "defer[s] or give[s] any specific evidentiary weight, including

controlling weight, to any medical opinion(s) or prior administrative medical finding(s),

including those from [the claimant's] medical sources."  20 C.F.R. § 404.1520c(a).

Rather, the "factors of supportability . . .  and consistency . . . are the most important

factors" to be considered when the ALJ determines how persuasive she will "find a medical source's medical opinions or prior administrative medical findings to be." 20 C.F.R. § 404.1520c(b)(2). The ALJ must "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings" in the determination. *Id.* An ALJ may discount a medical source's opinion if she concludes his opinion is inconsistent with his treatment notes or that he overly relied on a claimant's subjective complaints rather than objective medical evidence. *See Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011); *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009).

As already described, the ALJ explained that she found Schill's medical source statement unpersuasive because it was "not consistent with the minimal physical examination findings, inconsistent symptom reports, and inconsistently reported activities of daily living," and she specifically called out Plaintiff's "inconsistent" pain behavior and the lack of regular gait findings that would be consistent with a limitation to sedentary work. (R. 154.)

Plaintiff argues the ALJ found Schill's opinions inconsistent with Plaintiff's reported ADLs but did not explain what ADLs were inconsistent. (Pl.'s Mem. at 34.) The ALJ seems to have referred primarily if not entirely to the November 2017 function report (*see, e.g.,* R. 147–148 (referring exclusively to the November 2017 function report in assessing Plaintiff's limitations)) and made no explicit mention in her determination of the March 2018 disability report, the April 2018 function report, or the July 2018 disability report, all of which conveyed more limited ADLs than she reported in

November 2017.  Her only nod to those reports was the mention that "[o]n reconsideration, the claimant reported limited, but primarily consistent activities of daily living, although she denied doing household chores." (R. 149.)  The ALJ also rejected Plaintiff's husband's third-party function report from May 2019 as inconsistent with Plaintiff's reports of her ADLs, although it appears to be largely consistent with Plaintiff's 2018 reports.  (R. 155.)[7]

If Plaintiff's reported ADLs had been the sole, or even primary, reason for discounting Schill's opinion, the ALJ's failure to explicitly address the later reports and describe the respects in which he found Schill's opined limitations to be inconsistent with Plaintiff's reported ADLs might be a stronger argument for remand.  But that was far from the primary basis for the ALJ's determination.  The ALJ relied on the lack of objective medical evidence, including only mild findings on June 2018 and August 2019 imaging and EMG studies, minimal physical examination findings, lack of consistent gait findings, and the inconsistent symptom reports and pain behavior, to conclude that the record did not support Plaintiff's claims about her limitations or the limitations to which Schill opined.  Moreover, Schill essentially discounted his own opinions, citing the "limited objective evidence to support her disability application," (R. 2898), the fact that her surgeons had "refused to complete her paperwork," (*id.*), his own lack of expertise (*id.*), and his request that Plaintiff undergo a physical performance test "to clarify her

---

[7] On the other hand, in an August 2018 eye exam visit, Plaintiff described herself as a "stay at home mom" whose hobbies were "[her] child, movies, beach, swimming, and video games."  (R. 3016.)

physical limitations and restrictions."  Finally, Schill's one-page statement cites no

specific clinical findings to support the proffered limitations.  The Eighth Circuit has

commented that an ALJ may disregard conclusory medical opinions that are not tied to

objective clinical findings.  *See Teague*, 638 F.3d at 616.

Accordingly, the Court finds that the ALJ sufficiently described her reasons for

discounting Schill's medical source statement, and that substantial evidence of record

supports her finding in that regard.

### D.     Whether the ALJ's Adequately Considered Plaintiff's Somatoform Disorder

Finally, Plaintiff argues that the ALJ failed to consider whether her somatoform

disorder contributed to a combination of impairments that rendered her disabled.  Pain

can cause disability.  *Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991).  The ALJ

must evaluate the credibility of a claimant's subjective pain complaints by considering

"(i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the

claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness,

and side effects of medication; and (v) the claimant's functional restrictions."  *Vance v.*

*Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017); *see* 20 C.F.R. § 404.1529(c)(3); SSR 16-

3p, 2016 WL 1119029, at *7.  The ALJ may discredit subjective complaints only if they

are inconsistent with these factors shown by the record as a whole, not solely based on

lack of supporting objective medical evidence.  *Nowling v. Colvin*, 813 F.3d 1110, 1114

(8th Cir. 2016).  If the subjective complaints come in part from a claimant's testimony,

the ALJ must determine the claimant's credibility and explain the finding.  *Id.*

Somatoform disorder complicates this evaluation because "[a] prime feature . . . may be a disconnect between the actual severity of symptoms demonstrated by clinical evidence and the way the applicant subjectively perceives the symptoms." *Id.*

The determination leaves the Court in considerable uncertainty about how, if at all, the ALJ meaningfully considered Plaintiff's somatoform disorder. On the one hand, the ALJ not only acknowledged the diagnosis of somatoform disorder but identified it as one of Plaintiff's severe impairments. (R. 146.) Yet, she then discounted it as a diagnosis that was "indicated on a one-time basis" and noted that while it was "somewhat consistent with the lack of examination findings," it was inconsistent with Plaintiff's functional reports and the description of activities provided to Karayusuf. (R. 149.)

The confusion about how the ALJ evaluated the impact of Plaintiff's somatoform disorder on her RFC is evident in her comments on Plaintiff's subjective reports of pain. While the ALJ stated that she "appreciat[ed] and has considered the argument related to a somatoform disorder," she found it "notable that even [Plaintiff's] subjective reports were highly inconsistent throughout the file." (R. 153.) This suggests that in the ALJ's view varying subjective reports of pain and symptoms are a reason to discount the existence, severity, or impact of a somatoform disorder. (R. 153.) But the ALJ does not explain the basis for that position, and nothing in the medical records makes that logical leap.

It is also in this area that the ALJ's seeming failure to account for the deterioration in Plaintiff's ADLs between the December 2017 report and the reports submitted in 2018 and early 2019 is problematic. After highlighting the December 2017 function report almost exclusively in discussing Plaintiff's limitations, the ALJ noted in passing that on

reconsideration Plaintiff reported "limited, but primarily consistent activities of daily living, although she denied doing household chores." (*Id.*) Yet, she later described Plaintiff's reported activities of daily living as "highly inconsistent throughout the file" and then as "inconsistently good." (R. 153.) As a result, it is impossible to determine how the ALJ took the later function and disability reports into account in evaluating the impact of Plaintiff's limitations generally or her somatoform disorder in particular, or, conversely, whether she took into account the somatoform disorder in her assessment of the function and disability reports.

Relatedly, although the ALJ suggests that she found Plaintiff's testimony not credible, she does not make such a finding explicitly nor offer an explanation beyond the inconsistency the ALJ alluded to but did not describe in Plaintiff's subjective complaints and ADLs. As the Eighth Circuit held in *Easter v. Bowen,* 867 F.2d 1128, 1131 (8th Cir. 1989), "[w]ithout expressly finding the claimant's testimony not credible, the ALJ is not free to reject her subjective experiences in this way, particularly since she has a diagnosed mental disorder that causes a distorted perception of her physical ailments." *See also Nowling,* 813 F.3d at 1114. The ALJ here did not make explicit credibility findings, nor did she specifically address whether the somatoform disorder could account for the inconsistencies in Plaintiff's reported symptoms, rather than those inconsistencies undermining the credibility of Plaintiff's allegations. For example, the ALJ does not seem to consider whether the example of inconsistent pain behavior that she cited as indicative that Plaintiff's allegations were not supported by the evidence—the January 2019 Schill examination (R. 2975 ("At times very light touch will elicit howls of pain.

The same area then can be palpated when distracting the patient without any precipitation of pain.")—could in fact be explained by Plaintiff's somatoform disorder.

Finally, and fundamentally, notwithstanding the lip service paid to Plaintiff's somatoform disorder, the ALJ's emphasis on the lack of objective clinical findings effectively ignored the disorder in assessing Plaintiff's limitations and RFC. *See Nowling*, 813 F.3d at 1122 (reversing the ALJ in part because they "at no point accorded any consequence to [the somatoform disorder] or to the nuance our court recognized in *Easter* that somatoform disorders may be disabling and may result in a distorted perception of physical ailments.") (cleaned up).

The Commissioner argues that even if the ALJ erred in evaluating the somatoform disorder, the overall determination of Plaintiff's RFC is supported by the lack of objective evidence. Furthermore, the Commissioner argues, the ALJ's decision to discount the somatoform disorder is supported because only Lexau diagnosed it and he suggested the possibility of secondary gain factors, Plaintiff was unwilling to pursue recommend mental health treatment, Plaintiff told the state unemployment office she was looking for work, and Plaintiff's ADLs were not consistent with her pain complaints. (Def.'s Mem. at 27–29.) The Court disagrees. First, the lack of objective evidence to support subjective complaints is inherent to somatoform disorder and does not in and of itself establish that the disorder, standing alone or taken together with other impairments, is not disabling. That conclusion requires further analysis, analysis which the ALJ did not perform. *See Nowling*, 813 F.3d at 1122.

Second, even though Lexau was the only one to make the diagnosis, the ALJ

adopted it at step two. Having done so, it was incumbent on the ALJ to determine whether the disorder was disabling, and the fact that it was only diagnosed once during the relevant period contributes only marginally to that determination, while the ALJ was required to examine numerous other factors. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029, at *7.

Third, while the ALJ alluded to Lexau's speculation about secondary gain and mentioned elsewhere in the determination the inconsistency in Plaintiff's representations regarding unemployment benefits, she did not explain whether, if at all, they affected her view of the impact of the disorder on Plaintiff's claim. And she did not mention at all Plaintiff's unwillingness to pursue mental health treatment, let alone address the possible reasons for that reticence and how they would affect her assessment of Plaintiff's limitations and RFC. *See* SSR 16-3P, 2016 WL 1119029, at *8 ("We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.")

Accordingly, the Court concludes the ALJ's determination of Plaintiff's RFC was not supported by substantial evidence because the ALJ failed to consider the impact of Plaintiff's somatoform disorder in evaluating the evidence pertaining to Plaintiff's symptoms, limitations, and ADLs, and failed to explain how she resolved conflicts within that evidence. While the ALJ is not required to discuss every piece of evidence submitted, *Wildman v. Astrue*, 596 F.3d 959 (8th Cir. 2010), the confusion about the evidentiary basis for the ALJ's findings and her consideration of the somatoform disorder

mandate remand for further consideration.  *See Willcockson v. Astrue*, 540 F.3d 878, 879-

880 (8th Cir. 2008).  Accordingly, the ALJ's decision will be reversed and remanded to

the Commissioner.  On remand, the Commissioner must consider all of the evidence

during the relevant period regarding Plaintiff's ADLs, including the disability reports and

function reports she submitted, not just the December 2017 function report, and must also

explain the consideration given to the somatoform disorder and how that affects the

assessment of Plaintiff's subjective symptoms and her RFC.

## III.    CONCLUSION

Accordingly, based on all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that

1.    Plaintiff's Motion for Summary Judgment [ECF No. 22] is **GRANTED**;

2.    Defendant's Motion for Summary Judgment [ECF No. 28] is **DENIED**;
and

3.    This matter is **REMANDED** to the Commissioner for reconsideration of
Plaintiff's claim for benefits as discussed in Section II.D.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 30, 2022                    *s/ Hildy Bowbeer*
                                          HILDY BOWBEER
                                          United States Magistrate Judge